UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| PHIPPSBURG SHELLFISH | ) | |
| CONSERVATION COMMISSION, | ) | |
| et al. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | 2:11-cv-00259-JAW |
| | ) | |
| UNITED STATES ARMY CORPS | ) | |
| OF ENGINEERS et al., | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER ON MOTION FOR PRELIMINARY INJUNCTION**

On September 1, 2011, Bath Iron Works (BIW), one of the nation's premiere shipbuilders, intends to launch the U.S.S. Spruance, a billion dollar guided missile DDG Destroyer, from her home state in Bath, Maine for her home port in San Diego, California. In August, 2011, the United States Army Corps of Engineers (Corps) intends to dredge two areas in the thirteen mile trip from Bath to the open ocean in order to assure the Spruance safe passage in the first leg of her maiden voyage. The Plaintiffs—local residents, business owners, and conservationists— seek an injunction to restrict the extent of the Corps' proposed dredging in order to minimize the harm to the area's marine and economic life. The Court denies the Plaintiffs' motion for a preliminary injunction.[1]

---

[1] The parties placed difficult time constraints on the Court. The Court first became aware of this controversy on July 1, 2011 with the filing of the Complaint, but the information was incomplete. On July 18, 2011, the Corps filed the Administrative Record, consisting of three DVDs, and literally thousands of documents; the index alone consists of seventy-nine pages. *Notice of Lodging of the Admin. R.* (Docket # 20). The Corps responded to the motion for preliminary injunction on July 18,

## I. STATEMENT OF FACTS

### A. BIW, the U.S.S. Spruance, and August Dredging

BIW is located in Bath, Maine thirteen miles up the Kennebec River from the open ocean. AR1:10. To reach the ocean from Bath, the Spruance must navigate the Kennebec through two potentially difficult stretches of water: Doubling Point and Popham Beach. AR1:6, 10-11. The entire 13 mile course from Bath through Popham Beach is denominated a Federal Navigation Project (FNP) and Congress has authorized a channel of 27' below Mean Lower Low Water (MLLW) and a width of 500'. AR1:10. Because the Kennebec, particularly at Doubling Point and Popham Beach, is subject to shoaling, in order to maintain the authorized depth and width of the FNP, the Corps must periodically perform dredging operations along the river. AR1:6, 12-13. Prompted by the concerns of the United States Navy about whether the channel of the Kennebec River in these two areas is deep and wide enough to permit the Spruance safe passage, the United States Army Corps of Engineers proposes to dredge these two areas beginning on August 1, 2011. AR1:10-11.

August is not the best time to dredge coastal rivers in Maine. It is when Maine is most vibrant economically and most fertile ecologically. AR1:75-81. Each August, the state experiences a seasonal migration of visitors, who are a vital part

---

2011 and BIW filed a memorandum on July 19, 2011. The Plaintiffs replied on July 20, 2011. The Plaintiffs requested a non-testimonial hearing, which was held on July 25, 2011. At the end of the hearing, the parties confirmed that they would appreciate a ruling before Monday, August 1, 2011, which gave the Court only four full days among other judicial duties to issue an opinion. The Court has done its level best, but the parties should appreciate "the temporal constraints under which the district court labored" in arriving at this decision. *Bl(a)ck Tea Soc'y v. City of Boston*, 378 F.3d 8, 15 (1st Cir. 2004).

of the Maine economy, and for certain types of marine life, August is a critical month. *Id.* The people who live and work around this thirteen mile stretch of the Kennebec are anxious about the impact the Corps' dredging will have on them and on marine life. *Id.* Plaintiffs have filed suit to limit the proposed dredging to what, in their view, is essential to allow the Spruance to successfully leave Bath. *Am. Compl. for Inj. and Decl. Relief* ¶ 3-4 (Docket # 18) (*Am. Compl.*). After the Plaintiffs filed suit against the Corps, BIW was permitted to act as an intervenor. *Order Granting Without Objection Mot. to Intervene* (Docket # 12). In filing suit, the Plaintiffs stress they do not seek to prevent the Spruance from setting sail or seek to interfere with its navigation of the Kennebec; they only wish to diminish the harm that they predict extensive August dredging will cause and that will remain long after the Spruance leaves. *Am. Compl.* ¶ 3-4.

They have reason. Although Congress authorized dredging in the Kennebec in 1940 and the Corps has dredged the river twenty-one times since then, the time of year when dredging may occur has been restricted for decades. AR1:6, 12-13 In 1989, the Maine Department of Environmental Protection (MDEP) allowed dredging of the Kennebec only between September 10 and October 10 or November 1 and April 30 of each year. *Am. Compl.* ¶ 34. In 1997, the MDEP further restricted dredging until after November 15 of each year to protect the shortnose sturgeon. *Id.* ¶ 35. Then in 2002, the MDEP issued a permit, which remains effective and which limited the permissible hopper dredging to the period between

December 1 and March 15 and long term mechanical dredging from between November 1 and April 1. *Id.* ¶ 37-38.

While acknowledging that the period between late fall and early spring would be preferable, the Corps contends it is faced with an emergency that necessitates action this August. It explains that on November 23, 2010, the United States Navy informed the Corps that shoaling had hindered the transit of the U.S.S. Jason Dunham, requiring the vessel to transit outside the navigation channel, an act that the Navy described as an "extraordinary maneuver" and the Navy requested the Corps to clear the channel. AR1:218. In December 2010 and February 2011, the Corps surveyed both Doubling Point and Popham Beach and determined that shoaling had occurred in both areas. AR1:13-14. In February 2011, BIW conducted sea trials of the Spruance and navigated the vessel outside the federal channel. *Id.* May surveys confirmed that shoaling persisted at both Doubling Point and Popham Beach. AR1:108-09. The Corps concluded that the Spruance could not safely transit these areas on September 1, 2011 and applied for a dredging permit.

### B.     The Statutory Backdrop

The Plaintiffs pose two legal challenges to the Corps' proposed dredging: 1) alleged violations of the Clean Water Act (CWA); and, 2) alleged violations of the National Environmental Policy Act (NEPA). *Am. Compl.* ¶ 2.

#### 1.     CWA

The CWA prohibits "the discharge of any pollutant by any person," except "in compliance with law." 33 U.S.C. § 1311(a) (§ 301(a)). To discharge dredged material, the CWA requires a person to obtain a permit from the Corps, 33 U.S.C. §

1344 (§ 404); however, when the Corps is the entity seeking to discharge dredged material into disposal sites, "the agency does not issue a permit to itself." *Def.'s Mem. in Opp'n to Mot. for Prelim. Inj.* at 2 (Docket # 21) (*Corps' Opp'n*). Instead, "the Corps authorizes its own discharges of dredged or fill material by applying all applicable substantive legal requirements, including public notice, opportunity for public hearing, and application of the section 404(b)(1) guidelines." 33 C.F.R. § 336.1(a). In general, the § 404(b)(1) guidelines mandate that "no discharge of dredged or fill material shall be permitted if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences." 40 C.F.R. § 230.10(a). "Practicable" is defined as "available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes." 40 C.F.R. § 230.10(a)(2). In addition, the CWA "requires the Corps to seek state water quality certification for discharges of dredged or fill material into waters of the United States." 33 C.F.R. § 336.1(a)(1).

## 2. NEPA

The NEPA "is our basic national charter for protection of the environment." *United States v. Coalition for Buzzards Bay*, Nos. 10-1664, 10-1668, 2011 U.S. App. LEXIS 9927, *9 (1st Cir. May 17, 2011) (quoting 40 C.F.R. § 1500.1(a)). Under NEPA, before approving a proposed dredge and fill project, the Corps must determine whether the action will "significantly affect[] the quality of the human environment." 42 U.S.C. § 4332(C). To do so, the "responsible official" must make a detailed statement "on (i) the environmental impact of the proposed action, (ii) any

adverse environmental effects which cannot be avoided should the proposal be implemented, (iii) alternatives to the proposed action, and (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented." 42 U.S.C. § 4332(C)(i-v). NEPA requires federal agencies to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(2)(E). The Supreme Court has held that NEPA mandates that the Corps take a "'hard look' at the environmental consequences" of a proposed project. *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976).

## C.     The Environmental Assessment and § 401 Certification

Here, the Corps prepared an Environmental Assessment (EA) rather than a more elaborate Environmental Impact Statement (EIS) and made a finding of no significant impact (FONSI).[2]    AR1:1-106.    On February 24, 2011, the Maine Department of Marine Resources held a public hearing which the Corps attended. AR1:112. On March 1, 2011, the Corps issued a Public Notice for an emergency out-of-season (August) maintenance and advanced maintenance dredging of the FNP in the Kennebec River, solicited public comment, and responded to seven letters.

---

[2] The Plaintiffs do not challenge the Corps' decision not to prepare a more elaborate EIS. *See Coalition on Sensible Transp. v. Dole*, 826 F.2d 60, 66-67 (1st Cir. 1987) (listing the factors under which a court examines a decision not to prepare an EIS); *Northwest Bypass Group v. United States Army Corps of Eng'rs*, 470 F. Supp. 2d 30, 61-62 (D.N.H. 2007).

AR1:75-81. On March 2, 2011, the Corps re-initiated a § 7(c) consultation process with the National Marine Fisheries Service (NMFS) under the Endangered Species Act for the shortnose sturgeon and Atlantic salmon. AR1:335-37. The Corps also applied to the state of Maine for a new § 401 water quality certification. *See* AR3:1179.

### D. The Plaintiffs' Position

The Plaintiffs have stressed throughout this process that they "do not oppose any and all dredging in August." *Pls.' Am. Mot. for Prelim. Inj.* at 2 (Docket # 7) (*Pls.' Mot.*). They "fully support the Corps' and Navy's goal to enable safe transit of the USS Spruance this September." *Id.* Plaintiffs' main complaint against the Corps' proposed August dredging is that it is too extensive and the more substantial dredging should be done in the winter. The Plaintiffs' argument, thus, starts with the two premises: 1) that dredging during the winter months is preferable because it minimizes the impact on the Maine environment and economy; and 2) that given the enhanced harm from August dredging, its scope must be limited to what is necessary to allow safe passage for the Spruance in September. They contend that regarding the proposed dredging at Doubling Point, the Corps should be satisfied with a maintenance depth of 29' and not seek advanced maintenance dredging of 32' and that regarding the proposed dredging at Popham Beach, there is currently a lane of travel sufficient to permit safe passage and no dredging should be allowed at all. *Id.* at 4-5. They also raise specific objections about the adequacy and legality of the process the Corps used in complying with NEPA and the CWA. *Id.* at 3-13. Turning to the classic criteria for the issuance of injunctive relief, the Plaintiffs

address the likelihood of success on the merits, irreparable harm, balancing of the harms, and the public interest. *Id.* at 3-20.

## 1. Likelihood of Success on the Merits

### a. No Action At Popham Beach

The Plaintiffs contend that the Corps "dismissed the no action alternative [at Popham Beach] due solely to the Navy's navigational concerns at Doubling Point" and failed to "separately consider a no dredge alternative at Popham Beach." *Id.* at 5. They say the Corps focused only on Doubling Point and neglected to consider that there is no current barrier to navigation at Popham Beach. *Id.* at 6.

### b. Minimal Summertime Dredging and Alternative Dredging Methods and Disposal Sites

Next, the Plaintiffs say that the Corps "failed to consider a minimal dredge solution, either at [Doubling Point] or [Popham Beach]," "less impactful dredging methods, including mechanical clamshell bucket, and alternative disposal sites, including upland and offshore disposal." *Id.* at 7, 9.

### c. CWA Violation

The Plaintiffs claim that by failing to consider anything other than "full scale summertime dredging and overdredging," the Corps' proposed dredging violates the CWA's "less environmentally damaging practicable alternative" (LEDPA) standard under 40 C.F.R. § 230.10(a). *Id.* at 12.

## 2. Irreparable Harm

The Plaintiffs describe the nature of the irreparable harm from the more extensive August dredging as both procedural and substantive. *Id.* at 13. The

Plaintiffs say that the procedural harms include 1) basing the Corps review on "a limited range of alternatives—full scale dredging and overdredging—that have the greatest environmental impacts," 2) once dredging begins, the Corps will not have the "time to correct the procedural violation under the CWA, and thus, as with NEPA, without an injunction the opportunity to cure the violation will be lost." *Id.* at 14-15. According to the Plaintiffs, the substantive harms include the failure to comply with the LEDPA standard and the irreparable harm to the environment and the Plaintiffs that will occur from excessive dredging. *Id.* at 14-15.

### 3.  Balancing the Equities

The Plaintiffs say that neither the U.S. Navy nor the Corps will suffer any harm by more extensive dredging in the wintertime. *Id.* at 18. They point out that they accede to some dredging to allow the Spruance to transit the Kennebec, so the Corps cannot properly assert that the additional proposed dredging is necessary to meet an emergency. *Id.* They also say that the use of the Seguin dump site instead of Jackknife Ledge would have no impact on the Corps. *Id.* To the extent the Corps argues that the Plaintiffs' approach would cost additional money or would cause timing problems, the Plaintiffs respond that the crisis is one of the Corps' own making. *Id.* at 18-19.

### 4.  Public Interest

Having structured their request to avoid interfering with the Spruance's transit, the Plaintiffs assert that the public interest strongly favors a more restrictive August dredging since it causes environmental and economic harm that

would be avoided if advance maintenance dredging took place in the winter. *Id.* at 20.

### E.    The Corps' Response

#### 1.    The Articulated Purpose of the Project

The Corps notes that a court must uphold an agency action unless the action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." *Corp's Opp'n.* at 10 (citing 5 U.S.C. § 706(2)(A)). The Corps points out that it defined the dredging project to meet not only the Navy's concerns about the Spruance, but also "to maintain the Kennebec River FNP to allow safe navigation of the lower Kennebec River consistent with the levels of navigation Congress intended in authorizing the FNP." *Id.* at 11 (citing EA at AR1:10). In view of the broader purpose of the August dredging, the Corps says the Plaintiffs have "wrongfully narrowed the purpose of the proposed activity to the safe passage of the Spruance" and when the broader purpose is taken into account, the Corps asserts its proposed solution becomes "eminently reasonable." *Id.* at 12.

#### 2.    Likelihood of Success

##### a.    NEPA

Turning to the Plaintiffs' allegation that it failed to consider the "no action" alternative to dredging at Popham Beach, the Corps responds that once the purpose of the overall project is considered, the no action alternative at Popham Beach is not acceptable because it "would be inconsistent with the objectives of the project," namely to maintain the FNP at congressionally-authorized levels from Bath through Popham Beach. *Id.* at 13. Next, the Corps says that "so long as 'all

reasonable alternatives' have been considered and an appropriate explanation is provided as to why an alternative was eliminated, the Corps has satisfied its obligation under NEPA." *Id.* The Corps dismisses the Plaintiffs' contentions about the likelihood of a safe transit for the Spruance in September around Popham Beach, observing that it has "its own considerable expertise," which is combined with that of the Navy, on this issue. *Id.* at 15. It asks the Court to give its agency expertise "due deference." *Id.*

The Corps rejects the Plaintiffs' demand that it perform only minimal dredging in August. *Id.* at 14-15. It points out that the Kennebec River is a "dynamic system influenced by strong tidal currents and occasional significant storm runoff events." *Id.* at 15 (quoting EA at AR1:47). The Corps disagrees with the Plaintiffs' use of prior safe passages, including navigation outside the channel, as indicative of the future safe passages, noting that the Kennebec River presents not only shoaling hazards but ledge and rock obstructions as well. *Id.* at 15-16.

Addressing the Plaintiffs' proposed dredging alternatives, the Corps says that their proposals "ignore the environmental risks associated with a mechanical dredge" and the Corps' conclusion that "mechanical dredging was unworkable given the hydrogeographic conditions of the Kennebec River system." *Id.* at 17. The Corps also rejects the Plaintiffs' proposals about the use of the Seguin and Portland disposal sites, arguing that the Plaintiffs failed to present evidence that the Corps' policy of retaining sand within the littoral system is inappropriate. *Id.*

### b.    CWA

#### i    The Corps' Choices

In response to the Plaintiffs' CWA challenge, the Corps assert that it selected an alternative that "it found to be the least environmentally damaging practicable alternative pursuant to the Section 404(b)(1) Guideline" and its conclusion was "not arbitrary and capricious and should be upheld." *Id.* at 18. The Corps explain that it rejected the no action alternative because it failed "to provide the authorized project depths that Congress has deemed appropriate for navigation in the Kennebec River." *Id.* (quoting EA at AR1:10).

The Corps insists that it evaluated the Plaintiffs' proposal that it dredge only to a maintenance depth, not an advanced maintenance depth at Doubling Point, and that it rejected the proposal because advance maintenance depth "would allow the FNP to remain at its authorized depths for a longer time," because the Plaintiffs' alternative would "lead to less recovery time for biological communities," and ongoing maintenance costs would increase "by requiring additional dredging nearly twice as often." *Id.* at 19. The Corps further says that there would be no guarantee that future dredging would have to occur in the summer anyway because of "the unpredictability of shoaling and the future needs of navigation." *Id.*

Regarding Popham Beach, the Corps concluded that "performing the maintenance dredging to -27' would be the least environmentally damaging practicable alternative." *Id.* at 20. It notes that it concluded for Popham Beach that "advanced maintenance would not be necessary or appropriate." *Id.* Yet the Corps concluded that failing to dredge at all at Popham Beach "would not achieve

the project purpose of maintaining the [c]ongressionally authorized depths of the FNP." *Id.*

The Corps defended its choices of Jackknife Ledge and Bluff Head as disposal sites. *Id.* It said these sites would keep "sandy materials within the riverine and littoral system," that the sand and gravel "do not carry contaminants," and that it "relied on studies that showed that disposal at the in-river Bluff Head site would not cause adverse impacts upon down-river clam flats or other water quality concerns due to the sandy nature of the dredged materials." *Id.*

The Corps also maintained that the hopper dredge as opposed to a mechanical dredge was "the practicable and less environmentally damaging alternative." *Id.* at 21.

### ii    The Plaintiffs' Alternatives

Having defended its decisions, the Corps attacked the Plaintiffs' alternatives as impractical and doomed to failure. *Id.* at 21-24. It says the Plaintiffs' "vague 'minimal dredging' proposal is simply unworkable for purposes of accomplishing the projected purpose of maintaining the Kennebec FNP to its authorized depths." *Id.* at 22. Due to the "dynamic shoaling" of the Kennebec River, the Corps asserts that the "minimal dredging" proposal fails to meet the practicality standard of the § 404(b)(1) Guideline. *Id.* The Corps claims that the Portland disposal site is six hours from the Kennebec and would significantly increase time and costs. *Id.* Furthermore, the Corps maintains that the lobstermen's concerns about disposal at Jackknife Ledge would be echoed at the Seguin Island and Portland disposal sites. *Id.* 23-24 Although the Corps acknowledges that some lobsters will be buried by the

disposal at Jackknife Ledge, the Corps asserted that with planning the impact can be minimized. *Id.* The Corps criticizes the Plaintiffs' two-tier approach by observing that two separate dredging operations will likely cause more environmental harm than one. *Id.* at 23.

### 3. Irreparable Harm

To demonstrate irreparable harm, the Plaintiffs, according to the Corps, must show what incremental irreparable harm is going to occur as a result of dredging beyond the level of dredging they accept as necessary. *Id.* at 25. This, the Corps claims, the Plaintiffs cannot do. *Id.* Second, the Corps asserts that to the extent the Plaintiffs have alleged harms, they have not demonstrated that the harms will be irreparable. *Id.* Third, the Corps disputes the Plaintiffs' contentions about the impact on lobster, noting that there are no lobsters at Doubling Point or Bluff Head and the impact on lobsters at Popham Beach and Jackknife Ledge will be minimal. *Id.* at 25-26.

### 4. Balancing Harms

Pointing to issues of military security, navigational safety, and administrative law, the Corps contends that the balance of harms must be struck in favor of its dredging plan. *Id.* at 27-28. It points out that if the Court requires the Corps to alter its dredging proposal, it will be required to research and obtain approval for the Court-ordered alternatives since none has yet been approved. *Id.* at 27. The Corps notes that the launching of the Spruance is a tightly-scheduled event, which dovetails with a series of other naval schedules, and a delay in the launch date will have a cascading impact on naval operations around the globe. *Id.*

at 27-28.  Finally, the Corps raises the specter of grounding the Spruance if the vessel is required to take the Plaintiffs' chosen route to sea.  *Id.* at 28.

### 5. Public Interest

The Corps stands first on the public interest in military preparedness.  *Id.* at 29.  It also points out that the public has an interest in "continued safe, hazard-free navigation in the River."  *Id.*  It says that delayed advanced maintenance dredging will be inefficient and a waste of taxpayer dollars.  *Id.* at 30.  By contrast, the Corps characterizes the Plaintiffs' proposals as "vague and nebulous" and presses the argument that their demands for relief would "jeopardize the safe transit of the Spruance and the future passage of other deep draft military vessels as well."  *Id.*

### F. BIW's Objection

In its opposition to the Plaintiff's motion, BIW volunteers that a delayed launch of the Spruance and a limited dredging operation would affect not only the U.S. Navy, but also BIW.  *Objection of Intervenor Bath Iron Works Corp to Pls.' Mot. for a Prelim. Inj.* at 2 (Docket # 22).  BIW observes that the Navy has a right to expect that, once built, its new vessels will be able to transit, hazard-free, to the ocean, and that if BIW cannot so assure the Navy, there are other boatyards that will.  *Id.*  As the state of Maine's "largest single-site employer and a critical piece of the United States shipbuilding industrial base," BIW reminds the Court that it is a crucial employer to the professional livelihoods of many Maine men and women.  *Id.* at 3.  BIW says that it also dredges the Kennebec and worries that an injunction will circumscribe its ability to perform its own dredging and disposal operations.  *Id.* at 3-4.

BIW next claims that Plaintiffs are estopped from making the arguments in their motion because they waited a full thirty days after MDEP issued its permit on April 15, 2011 and then elected to appeal the granting of the permit to the Maine Board of Environmental Protection, not directly to Superior Court. *Id.* at 5. BIW also asserts that the doctrine of issue preclusion applies because the Plaintiffs already litigated and lost issues they are attempting to bring to federal court. *Id.* at 6. As a final point, BIW asserts that the Plaintiffs slept on their rights by delaying the state proceedings with a delayed appeal to an administrative board. *Id.* at 6-7.

### G.    The Plaintiffs' Reply

In their Reply, the Plaintiffs assert that by broadening the scope of their project, the Corps has attempted to define the problem away. *Reply of Pls.' and Town of Phippsburg to the Army Corps of Eng'rs' and Bath Iron Works' Resps. to the Mot. for a Prelim. Inj.* at 1-4 (Docket # 23). Once the Corps described its dredging goal beyond the safe transit of the Spruance, which was the catalyst for its application for an emergency exception to winter dredging, and expanded the dredging mission to include safe transit for all other vessels, the Plaintiffs claim the Corps impermissibly attempted to shift ground so that the Plaintiffs' alternatives to the August dredging could not be deemed reasonable. *Id.* at 2. Citing *Simmons v. United States Army Corps of Eng'rs*, 120 F.3d 664 (7th Cir. 1997), the Plaintiffs claim that such a transparent attempt to gain definitional advantage is prohibited. *Id.*

Next, the Plaintiffs say that the Corps' rejection of all alternatives, except advanced maintenance dredging, violates NEPA and CWA. *Id.* at 4. They reiterate

16

the view that the administrative record does not support the Corps' position that advanced maintenance dredging is necessary for Popham Beach and they assert that their minimal dredging alternative for Doubling Point is more cost effective, longer lasting, and has fewer environmental impacts than the Corps' proposals. *Id.* at 5-8. They contend that the administrative record does not support the conclusion that advanced maintenance dredging is the least environmentally damaging practicable alternative. *Id.* at 8-10.

Turning to the questions of irreparable harm, balancing of equities, and the public interest, the Plaintiffs assert that the Corps and BIW have conceded that the issuance of a decision without informed environmental consideration constitutes irreparable harm. *Id.* at 10. They stress again that they only seek dredging restrictions beyond what is necessary for the safe transit of the Spruance, and assert that their alternative would require "even less dredging, at lower cost and with less environmental impact, and, by utilizing the natural force of the river, would reduce long term and cumulative dredge impacts." *Id.* at 11. They end by re-emphasizing the narrow nature of the relief they are seeking. *Id.* at 11-12.

## II. DISCUSSION

### A. Legal Standards

#### 1. Preliminary Injunction Standard

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Court apply a familiar four-part test when considering a motion for injunctive relief:

"1) the likelihood of success on the merits; 2) the potential for irreparable harm if the injunction is denied; 3) the balance of relevant impositions, i.e., the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues; and 4) the effect (if any) of the court's ruling on the public interest."

*Iantosca v. Step Plan Servs., Inc.*, 604 F.3d 24, 29, n.5 (1st Cir. 2010) (quoting

*Bl(a)ck Tea Soc'y* , 378 F.3d at 11). "The party seeking the preliminary injunction

bears the burden of demonstrating that these four factors weigh in its favor." *Esso*

*Standard Oil Co. v. Monroig-Zayas*, 445 F.3d 13, 18 (1st Cir. 2006).

## 2. Arbitrary and Capricious Standard

The standard for judicial review of a federal agency action is found in the

Administrative Procedures Act: courts are directed to uphold an agency decision

unless it was "arbitrary, capricious, an abuse of discretion, or otherwise not in

accordance with law. . . ." 5 U.S.C. § 706(2)(A); *see Baltimore Gas & Elec. Co. v.*

*Natural Res. Def. Council*, 462 U.S. 87, 97-98 (1983) ("The role of the courts is

simply to ensure that the agency has adequately considered and disclosed the

environmental impact of its actions and that its decision is not arbitrary or

capricious"). The First Circuit explained that the task of a court reviewing agency

action under the APA's "arbitrary and capricious" standard is "to determine

whether the [agency] has considered the relevant factors and articulated a rational

connection between the facts found and the choice made." *Dubois v. United States*

*Dep't of Agric.*, 102 F.3d 1273, 1284 (1st Cir. 1996); *see Associated Fisheries of Maine*

*v. Daley*, 127 F.3d 104, 109 (1st Cir. 1997) (explaining that an agency action is

"arbitrary and capricious if the agency lacks a rational basis for adopting it—for

example, if the agency relied on improper factors, failed to consider pertinent

aspects of the problem, offered a rationale contradicting the evidence before it, or reached a conclusion so implausible that it cannot be attributed to a difference of opinion or the application of agency expertise"); *Penobscot Air Servs. v. Fed. Aviation Admin.*, 164 F.3d 713, 719 (1st Cir. 1999) ("The task of a court reviewing agency action under the APA's 'arbitrary and capricious' standard is to determine whether the agency has examined the pertinent evidence, considered the relevant factors, and 'articulated a satisfactory explanation for its action including a rational connection between the facts found and the choice made'").

Conversely, an agency decision is not arbitrary or capricious if "the agency decision was based on a consideration of the relevant factors and there has not been 'a clear error of judgment' . . . ." *Dubois*, 102 F.3d at 1285 (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971)). "The requirement that agency action not be arbitrary or capricious includes a requirement that the agency adequately explain its result and respond to relevant and significant public comments. However, neither requirement is particularly demanding." *Penobscot Air Servs.*, 164 F.3d at 719 n.3 (internal citations and quotation marks omitted).

The Court's review under this standard is "highly deferential," in that the agency action is presumed valid. *Associated Fisheries*, 127 F.3d at 109. In other words, this Court "is not empowered to substitute its judgment for that of the agency." *Overton Park*, 401 U.S. at 416; *see* 33 CHARLES ALAN WRIGHT & CHARLES H. KOCH, JR., FEDERAL PRACTICE AND PROCEDURE § 8334 (2006) ("Arbitrary and capricious review communicates the least judicial role, short of unreviewability, in

19

the word formula system"). Notwithstanding the deferential standard, "it is not a rubber stamp." *Dubois*, 102 F.3d at 1285. Rather, the Court "must undertake a 'thorough, probing, in-depth review' and a 'searching and careful' inquiry into the record." *Id.* (quoting *Overton Park*, 401 U.S. at 415-16). In carrying out its review under the APA, the scope of the Court's assessment includes the whole administrative record. *See* 5 U.S.C. § 706; *Overton Park*, 401 U.S. at 420 (district court review "is to be based on the full administrative record that was before the [agency head] at the time he made his decision"); *Cousins v. Sec'y of United States Dep't of Transp.*, 880 F.2d 603, 610 (1st Cir. 1989).

## B.   Likelihood of Success on the Merits

The First Circuit has described the importance of the first of the four factors comprising the preliminary injunction analysis: "The *sine qua non* of [preliminary injunction analysis] is likelihood of success on the merits: if the moving party cannot demonstrate that he is likely to succeed on his quest, the remaining factors become matters of idle curiosity." *New Comm Wireless Servs. Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002). With respect to this criterion, "a court's conclusions as to the merits of the issues presented on preliminary injunction are to be understood as statements of probable outcomes." *Narragansett Indian Tribe v. Guilbert*, 934 F.2d 4, 6 (1st Cir. 1991). In short to satisfy their burden on this prong, the Plaintiffs must be likely to succeed in showing that the Corps' Finding of No Significant Impact under NEPA and its conclusion that advanced maintenance dredging is the least environmentally damaging practicable alternative were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

law." *Town of Norfolk v. United States Army Corps of Eng'rs*, 968 F.2d 1438, 1445 (1st Cir. 1992) (quoting 5 U.S.C. § 706(2)(A)).

### 1.    The No Action at Popham Beach Alternative

Although in the EA the Corps addressed the "no action" alternative, EA at AR1:13-15, the Plaintiffs criticize the Corps' discussion as inadequate as regards Popham Beach. In the EA, the Corps stated:

> The "No Action" alternative would consist of not dredging in the shoaled areas of the Federal navigation project at Doubling Point and Popham Beach.

EA at AR1:13. The Plaintiffs correctly point out that most of the Corps' discussion of the "no action" alternative focused on Doubling Point.

However, the Administrative Record confirms that in February 2011 and in May 2011, the Corps performed hydrographic surveys of Popham Beach. AR1:455-60 (February 2011 Hydrographic Surveys Doubling Point & Popham Beach); AR1:461-65 (May 2011 Hydrographic Surveys Doubling Point & Popham Beach). On June 15, 2011, the Corps characterized the results of these surveys: "A minor amount of shoaling identified on previous surveys remained at the mouth of the river near Popham Beach." AR1:109. The Corps concluded that "[b]ased on the analysis of these factors, it was determined that maintenance dredging of the FNP was still warranted." *Id.* It proposed dredging both at Doubling Point and "at the mouth of the river near Popham Beach." *Id.* In view of these conclusions, the Corps' more generalized statements about the nature of shoaling in the Kennebec River, the impact of spring runoff, the risk of non-removal are equally applicable to Popham Beach:

Based on the hydrographic surveys, historic shoaling patterns, and coordination with the Navy, and Captain Walker, the Corps determined dredging of the channel is warranted and the "No Action" alternative would not be viable to address the navigation needs of the Navy. This determination was made in light of the most current information concerning the sand wave shoals, a projection of what the channel conditions might be in late August 2011 (i.e. prior to the scheduled departure date of the Spruance), and the contract procurement process. Likewise, beyond failing to address the immediate navigation needs, over the long term, the "No Action" alternative will result in additional shoaling and failure to provide the authorized project depths that Congress has deemed appropriate for navigation in the Kennebec River.

*Id.* at AR1:15.

Put another way, the Court is not in a position to review the dredging survey charts and challenge the Corps' characterization of the amount of shoaling at the mouth of the Kennebec River near Popham or the need for some dredging. *Kleppe v. Sierra Club*, 427 U.S. 390, 412 (1976) ("Resolving these issues requires a high level of technical expertise and is properly left to the informed discretion of the responsible federal agencies"); *Sierra Club v. Wagner*, 555 F.3d 21, 28 (1st Cir. 2009). To do so would require the Court to substitute its judgment for the Corps in an area of acknowledged Corps expertise. *Norfolk*, 968 F.2d at 1446 ("The court is not empowered to substitute its judgment for that of the [Corps]"). Instead, the Court must scour the Administrative Record to determine whether the Record reasonably supports the Corps' determination. Here, the Court concludes that the Corps' rejection of the "no action" alternative at Popham Beach is supported by the Administrative Record and the Plaintiffs are not likely to succeed in demonstrating

that the Corps failed to consider or to adequately consider the "no action" alternative for Popham Beach.

## 2. The Minimal Dredging Alternatives

The Plaintiffs next contend that the Corps failed to consider a minimal or pin point dredge solution at either Doubling Point or Popham Beach. *Pls.' Mot.* at 7-12. However, the Plaintiffs are plainly wrong. The Corps proposed to dredge Doubling Point to a depth of -30 MLLW (plus up to 2 feet of allowable overdepth) and to dredge Popham Beach to -27 MLLW (plus up to 2 feet of allowable overdepth). EA at AR1:97. Thus, the Corps considered and adopted a more minimal dredging solution to Popham Beach. Furthermore, the Corps' distinct treatment of Doubling Point and Popham Beach suggests it made a site specific determination of what was necessary at both dredging locations in order to avoid dredging more than necessary.

Turning to the EA, the Corps discussed the possibility of maintaining the Doubling Point site to its authorized dimensions. EA at AR1:15-16. By minimal dredging, the Corps was referring to dredging "to its authorized dimension of 27 feet deep MLLW and 500 feet wide in both the Doubling Point and Popham Beach reaches of the river." *Id.* at AR1:15. The Corps conceded that since "it would involve the removal of less material from the river than advance maintenance dredging, it would take less time to complete the work (approximately two to four weeks) and therefore possibly lessen the potential environmental impacts associated with the dredging (due to a shorter exposure time)." *Id.* at AR1:15-16.

But the Corps rejected this more minimal approach at Doubling Point. First, it concluded "because of the nature of the shoals (i.e. sandwaves) at Doubling Point removing less material (there) may mean that maintenance dredging is required sooner and more frequently than it would if advance maintenance dredging to deeper depths is performed." *Id.* at AR1:16. Second, more frequent dredging would mean that "there would potentially be less time for the affected biological communities to recover." *Id.* Third, more frequent dredging would require "remobilization of dredging equipment," which would be more expensive. *Id.* Even though this additional work might be completed during the winter months, it is also possible, given the "unpredictability of the shoaling in the river," that dredging outside the windows would be necessary "to clear shoaling that may be interfering with navigation." *Id.* For these reasons, the Corps rejected minimal alternative dredging at Doubling Point. Based on the detailed explanation in the EA, the Court cannot conclude that the Corps' conclusions were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

The Plaintiffs do not elaborate what they mean by pinpoint dredging or how it would be accomplished. *Pls. Mot.* at 7-8. "The generality of the argument made renders it ineffective." *Sierra Club*, 555 F.3d at 30. However, a review of the EA indicates that the Corps rejected the use of a hydraulic cutterhead dredge because the strong currents in the Kennebec River "would make positioning the dredge and pipeline extremely difficult." EA at AR1:17. The Corps rejected the use of a mechanical dredge and dragging for similar reasons. *Id.* at AR1:17-18.

The Plaintiffs insist that "[m]echanical dredging is clearly practicable" and they fault the Corps for employing hopper dredging when they say mechanical dredging is less ecologically harmful.  *Pls.' Mot.* at 9-10.  But the EA reveals that the Corps considered mechanical dredging and rejected it because it is "not as efficient as a hoper dredge for this type of dredging due to the currents and weather factors, especially at the mouth of the Kennebec River."  EA at A1:17-18.  It also concluded that because a mechanical dredge is stationary, it would "require more time to complete the work" and place sturgeon at greater risk.  *Id.* at 18.

Again, contrary to the Plaintiffs' position, the Corps considered this alternative and rejected it.  The Court defers, as it is required to do, to the Corps on which dredging method would be most efficient and least harmful.  In order to comply with the law, the Corps is not required to select the specific alternative that the Plaintiffs propose and the Court is in no position to make an independent assessment as to the comparative efficiency of different types of dredging methods.  *Sierra Club*, 555 F.3d at 28 ("courts have good reason to take seriously the deference due to the agency in technical and scientific matters").

### 3.    Disposal Areas

The Plaintiffs propose that the Corps dispose the dredged material at Sequin Island and at Portland.  But in the EA, the Corps discussed and rejected both sites.  EA at A1:20-21.  The Corps described both Sequin Island and Portland as open water disposal sites and noted that it is Corps policy to retain dredged sand "within the same littoral system whenever possible."  *Id.* at A1:20.  It rejected the Portland site for the additional reason that it is located 18 miles from the mouth of the

Kennebec River and approximately 29 miles from Doubling Point, thereby presenting issues of delay and expense. *Id.* at A1:20-21. On this point, apart from registering their displeasure, the Plaintiffs have provided precious little reason for the Court to conclude that the Corps erred.

### 4. The CWA

The Plaintiffs assert that the Corps violated the CWA by failing to consider the "no action" alternative at Popham Beach. *Pls.' Mot.* at 12-13. But the Court has resolved that the Corps did consider the "no action" alternative at Popham Beach and rejected it. Similarly, the Plaintiffs again raise the disposal issue, which the Court has determined in favor of the Corps. *Id.* at 13. Accordingly, the Court concludes that the Plaintiffs have not demonstrated a likelihood of success on their CWA claim.

### 5. Summary

Having concluded that the Plaintiffs have not demonstrated a likelihood of success in either their NEPA or CWA claims against the Corps, the Court has resolved the first and most important injunction criterion against the Plaintiffs. The Court could stop here. However for the sake of completeness, the Court will discuss the remaining three injunction criteria.

### C. Irreparable Injury

The Plaintiffs argue that the Corps has caused two types of irreparable harm: procedural and substantive. *Pls.' Mot.* at 13. They say "[t]he Corps' violation of NEPA is procedural; its failure to select the "less environmentally damaging practicable alternative under the CWA § 404(b)(1) Guidelines is both procedural

and substantive." *Id.* For the procedural harm to attach, the Court must conclude that the Corps committed a procedural violation and here, the Court has concluded it has not. Furthermore, even if the Court assumed that the Plaintiffs were successful on demonstrating a procedural miscue by the Corps, the First Circuit has stressed that "[t]he harm at stake in a NEPA violation *is* a harm to the *environment*, not merely to a legalistic 'procedure,' nor, for that matter, merely to psychological well-being . . . ." *Sierra Club*, 872 F.2d at 504. The Court is not convinced that the type of procedural error in this case amounts to "inadequate foresight and deliberation" that concerned the First Circuit in *Sierra Club*. *Id.*

For the substantive harm to attach, the Plaintiffs bear the burden to establish that the incremental harm that will flow from the enhanced dredging at Doubling Point would be irreparable and the Court has no basis on this Administrative Record to draw any such conclusion. It is true that if the Plaintiffs were correct and the Corps erred in not pursuing a "no action" alternative to dredging at Popham Beach, the lobsters who will perish as a result of the Popham Beach dredging and the Jacknife Ledge disposal would not have died. However, the Plaintiffs have not demonstrated that this harm—the killing of an uncertain number of lobsters—is truly an irreparable harm.

The Court concludes that the Plaintiffs have not demonstrated irreparable injury.

### D.     Balance of the Harms

The Plaintiffs claim that to fail to enjoin the Corps will reward its "bureaucratic inefficiency and intransigence." *Pls.' Mot.* at 20. However, the Corps'

points about the risk of error are overwhelming. Although the Plaintiffs assure the Court they are correct and that the U.S.S. Spruance can safely navigate the Kennebec River from Bath past Popham Beach, none of the Plaintiffs is going to be in charge of navigating this enormous, complex and expensive vessel down the Kennebec River, and by contrast, the Corps has responded to the concerns of the United States Navy about whether the Spruance is going to be able to reach the open ocean without mishap. The harm from a grounding of the Spruance in the accumulated shoals at Doubling Point or Popham Beach could be environmentally and economically catastrophic, affecting not only the vessel itself and its personnel, and polluting a stretch of the Maine coastline. Such an avoidable catastrophe could shake the confidence the Navy has reposed in BIW's capacity to launch naval vessels like the Spruance. Especially when the Plaintiffs concede that some dredging must be allowed, when the Court considers the harm caused by the incremental dredging the Plaintiffs seek to prohibit and the cascade of harms from dredging too little, the Court strikes the balance of harms heavily in favor of the Corps.

### E. The Public Interest

The public has a direct and significant interest in making certain that any dredging in the Kennebec River is carried out at a time and in a manner that minimizes environmental and economic harm. The public also has a strong interest in national defense and in the continued economic vitality of BIW. Given the stakes, the Court concludes that the public interest, although not entirely with the Corps, remains substantially so. At the same time, it may be that this process alone

will cause the Corps to foresee the need to keep the Kennebec River FNP periodically dredged within the wintertime guidelines so that emergencies like the one encountered by the U.S.S. Jason Dunham do not occur and that out of season dredging becomes the rare exception, not the rule.

## III.      CONCLUSION

The Court DENIES the Plaintiffs' Amended Motion for Preliminary Injunction (Docket # 7).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
CHIEF UNITED STATES DISTRICT JUDGE

Dated this 29th day of July, 2011